353 So.2d 826 (1977)
Darrell Edwin HOY, Appellant,
v.
STATE of Florida, Appellee.
Nos. 49448, 49449.
Supreme Court of Florida.
December 2, 1977.
Rehearing Denied January 30, 1978.
*827 Jack O. Johnson, Public Defender, Steven H. Denman, Chief Asst. Public Defender, and David S. Bergdoll, Asst. Public Defender, Bartow, and Patrick H. Doherty of Gross & Doherty, Clearwater, for appellant.
Robert L. Shevin, Atty. Gen., and Mary Jo M. Gallay, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
We have for review by direct appeal judgments of guilty of murder in the first degree and sentences of death. Jurisdiction vests pursuant to Article V, Section 3(b)(1), Florida Constitution.
The bodies of David Sawyer and Susan Routt (both teenagers) were discovered on the morning of August 27, 1975, on Dunedin Beach in Pinellas County. Appellant made several confessions as to his direct involvement in the murders and rape. He provided three versions of how the crimes were committed. It appears from the last version of the confession that appellant and one Jesse Lamar Hall went to Dunedin Beach where they saw the victims, David Sawyer and Susan Routt. They approached the victims' car, and Hall, with gun in hand, told the victims that appellant wanted to have intercourse with the girl. The victims' car was moved from the beach to a designated parking lot, and the boy and girl were forced at gunpoint to go with Hall and Hoy to a secluded area of the beach. With Hall guarding Sawyer, Hoy overcame Miss Routt's resistance and, ignoring her cries for help, sexually assaulted her. Attempting to break away from Hall to go to the girl's aid, Sawyer was shot in the face. After falling to the ground, he was shot twice more in the head. Hall then proceeded to take his turn in sexually assaulting Routt, both vaginally and anally. Hall shot her twice in the side of her head. Appellant then returned and assaulted her anally, after which he rolled her over and shot her in the forehead. Sawyer's wallet was then taken from his body by Hoy.
On September 27, 1975, appellant was charged by indictment with murder in the first degree of David Sawyer, with murder in the first degree of Susan Routt, with involuntary sexual battery of Susan Routt *828 and with robbery of David Sawyer. The public defender was appointed to represent him on September 7, 1975.
A motion to control pre-trial publicity was filed by appellant on September 11, 1975, declaring that, since his arrest, state and local officials had been quoted extensively concerning matters which directly or indirectly concerned the proceedings against him, and suggesting that quotations from public officials may exceed limits imposed by Disciplinary Rule 7-107, Code of Professional Responsibility. After hearing, this motion was denied by the trial court.
Appellant was arraigned October 10, 1975, and entered a written plea of not guilty. At that time, a trial date of December 15, 1975, was set. Motion for change of venue was filed on December 5, 1975, and an amended motion for change of venue was filed December 9, 1975. Therein, appellant alleged that a motion to control pre-trial publicity had previously been filed and denied and that, prior to and subsequent to the filing of that motion, appellant had received widespread prejudicial publicity, including, but not limited to, an article in the Clearwater Sun which concerned an alleged confession and reproduced portions thereof. Motion for continuance was filed by appellant on December 9, 1975, on the basis that, in view of the length and complexity of the case, the defense was unable to be ready for trial on December 15, 1975, and on the basis that a "cooling period" between the publication of extensive pre-trial coverage of his case and trial of the cause was necessitated. These motions were denied by the trial court on December 11, 1975.
The case proceeded to trial on December 15, 1975, resulting in a jury verdict of guilty of both charges of murder in the first degree and the charge of involuntary sexual battery. Judgment of acquittal had been entered as to the robbery charge, and a verdict of guilty was returned as to the lesser included charge of petit larceny. After sentencing hearing, a majority of the jury recommended life imprisonment. Prior to sentencing, the judge obtained a presentence investigation report and a psychiatric examination report. Upon considering and weighing the aggravating and mitigating circumstances, the trial judge determined that, under the circumstances presented, the imposition of the death penalty was appropriate on each charge of murder in the first degree.
Initially, appellant argues that the trial court erred in denying his motion for change of venue since pre-trial publicity regarding his case was extensive. He contends that his alleged confession was twice front page news in the local newspaper. Having considered this argument and carefully studied the record, including the jury voir dire, we find that the trial court did not err in refusing to allow a change of venue. Appellant has failed to show that he did not receive a fair and impartial trial, i.e., that the setting of his trial was inherently prejudicial. Cf. Dobbert v. State, 328 So.2d 433 (Fla. 1976). In Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975), the Supreme Court of the United States held that, under the circumstances of that case where there had been pervasive pre-trial publicity, defendant was not denied a fair trial, and opined:
"To resolve this case, we must turn, therefore, to any indications in the totality of circumstances that petitioner's trial was not fundamentally fair.
"The constitutional standard of fairness requires that a defendant have `a panel of impartial, "indifferent" jurors.' Irvin v. Dowd, 366 U.S. 717 at 722, 81 S.Ct. 1639, 6 L.Ed.2d 751. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' Id., at 723, 81 S.Ct. 1639, 6 L.Ed.2d 751. *829 At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate `the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' Ibid.
"The voir dire in this case indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside. Some of the jurors had a vague recollection of the robbery with which petitioner was charged and each had some knowledge of petitioner's past crimes, but none betrayed any belief in the relevance of petitioner's past to the present case. Indeed, four of the six jurors volunteered their views of its irrelevance, and one suggested that people who have been in trouble before are too often singled out for suspicion of each new crime  a predisposition that could only operate in petitioner's favor."
This court, in Dobbert v. State, supra, concluded that defendant had failed to show that the trial court abused its discretion in denying a motion for change of venue and explained:
"Relative to appellant's argument that the trial court erred in not allowing a change of venue, we find from the record that the trial judge did everything possible to insure an impartial trial for the defendant. The jurors, carefully and extensively examined by defense counsel to determine that they could be fair and impartial, were sequestered and comprehensive gag order was placed on all participants of the trial. As further evidenced by the record, seventy-eight prospective jurors were interviewed; allowed thirty-two peremptory challenges, the defense only exercised twenty-seven. Upon the selection of twelve persons, the trial judge denied the motion for change of venue with the following analysis:
"`Both the State and the defendant have challenges left. We have selected the jury.
"`Most times the jurors have heard about the case in some fashion from the media. However, a number of them did not hear about it. Some of them that did not hear about it are on the jury. Some are not.
"`As I said those that were selected, in the main, if I recall correctly, at least I was satisfied. I'm sure counsel for both sides have different ideas. I'm satisfied some of them had no opinions. If they had opinions they said that it would not affect their decisions. Some had impressions about the nature of the case. So I deny the motion for a change of venue.'"
Sub judice, the trial court questioned each group of prospective jurors extensively as to their prior knowledge of appellant's case and their exposure to publicity about it. The transcript of the voir dire evidences that a great many of the prospective jurors had not even heard about the case, others had read brief accounts, but mostly in the St. Petersburg Times rather than the Clearwater Sun, and only had a vague recollection, if any, of the occurrences. The allegedly inflammatory articles to which our attention is directed by appellant were contained in the Clearwater Sun. Only six jurors were excused by the trial court due to a prior acquaintance with the cause. Eleven were excused by the State by peremptory challenge. The defense utilized only twenty-five peremptory challenges when permitted forty by the trial court. With only a very few exceptions, the prospective jurors stated that they could unreservedly render an impartial verdict.
The voir dire of the jury selected to hear the cause reveals that eight of them had no prior knowledge whatsoever of the cause prior to being called for jury duty. Of the remaining four, one heard that the murder had happened from a customer, but that was the extent of her exposure, and she knew nothing more about it. Another remarked that she only read something briefly about it in the St. Petersburg Times when the news was first released that the murders had occurred and that she had not *830 heard or read anything about it since that time nor had she discussed it with anyone. Another remembered having seen something in the St. Petersburg Times about the case, but it had made no impression with her. The fourth juror stated that she had read something about the case when it first started but could not recall any facts and had not discussed it with anyone. It is obvious from the record that defense was satisfied with the jury selected, all of whom were completely impartial and had in no way been prejudiced by pre-trial publicity. This is supported by the fact that the defense had by no means exhausted its available peremptory challenges.
We cannot say that there was a significantly inflammatory atmosphere in the community or courtroom. We are buttressed in this view by the voir dire of all of the prospective jurors by the judge and counsel for the defense and prosecution. In Murphy v. Florida, supra, the Supreme Court determined:
"In the present case, by contrast, 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.
"In sum, we are unable to conclude, in the circumstances presented in this case, that petitioner did not receive a fair trial. Petitioner has failed to show that the setting of the trial was inherently prejudicial or that the jury selection process of which he complains permits an inference of actual prejudice."
The Supreme Court of the United States, in Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976), opined that "... pre-trial publicity  even pervasive adverse publicity  does not inevitably lead to an unfair trial."
Appellant relies on Oliver v. State, 250 So.2d 888 (Fla. 1971), for the proposition that a denial of motion for change of venue where the fact that defendant has confessed to a crime and the gist thereof is published constitutes reversible error. Appellee submits that appellant has misconstrued Oliver, supra, and posits that Oliver, supra, announces a general rule as to the granting of motions for change of venue when a confession is featured in news media coverage; however, it does not preclude the possibility that change of venue could properly be denied under certain circumstances when the fact of a confession having been made is disclosed to the public through the news media. Oliver, supra, involved a situation where excerpts from the actual confession, in question and answer form, given by Oliver to the assistant state attorney, were featured in the sole daily newspaper published in the general Tallahassee area. In the published transcript of the confession, Oliver implicated himself and others and expressly stated that he had a motive for the crime and gave a description thereof. Under the facts of that case, where the actual transcript of the confession was featured, this court announced as a general rule that "... when a `confession' is featured in news media coverage of a prosecution, as here, a change of venue motion should be granted whenever requested; we also hold that in the case sub judice the voir dire process cannot cure the effect of a `confession' which has been given news media coverage." (Emphasis supplied.)
The facts before us relative to this issue are different from Oliver, supra. Sub judice, we had publication of a report based on the statement of a detective summarizing three differing and contradictory statements made by the appellant. Published with equal prominence in these articles contained in the Clearwater Sun was appellant's retraction of his confession. Further, as appears from the record, none of the jurors even read the articles in question. The area in which the trial took place was not dependent on a sole daily newspaper for information. In fact, a great many of the perspective jurors did not read the Clearwater Sun but, rather, read the St. Petersburg Times. In the instant case, the voir dire of the jury evidences no prior knowledge *831 on their part of the publications to which appellant directs our attention.
Although recognizing that the granting or denying of a continuance is a matter within the sound discretion of the trial judge, appellant contends that the trial court erred in refusing to continue his case to allow a cooling period due to the allegedly prejudicial news reporting and to allow defense more time for effective preparation of appellant's case for trial. Viewing the totality of the circumstances present sub judice, we find the trial judge did not abuse his discretion in denying the continuance. As is apparent from the record, the news coverage in this case was not of such a nature that a cooling period was necessitated. Appellant's allegation of insufficient time for preparation of his case for trial was not sufficient to mandate the trial judge to grant the continuance.
In response to defendant's assertion that sufficient time had not been given to prepare for trial, that two months and four days from the date a person kills another is too short a time to prepare against the day when he will be called to the bar of justice to answer for his crime, this court, in Jarvis v. State, 115 Fla. 320, 156 So. 310, 312 (1934), held that the trial court did not abuse its discretion in failing to grant the requested continuance, and explicated:
"There is no authority in law for such a proposition. The Constitution secures to an accused person the right to a speedy and public trial by an impartial jury in the county where the crime was committed and to be heard by himself or counsel or both, etc. Section 11, Declaration of Rights, Const. 1885.
"None of those rights were taken from the accused, nor was an impediment to their full and free enjoyment by the accused placed in his way. Counsel's mere statement in their motion that they did not have time to prepare the defense is not sufficient. No facts are given on which to base such a statement, nothing is said as to the character of defense and the complex nature of it that would require more time, nor is anything said about witnesses and what was expected to be established by them, nor that the accused himself depended upon any named witnesses not within the jurisdiction of the court by whom he expected to prove the character of the act by which the life of the woman was taken."
Denying the petition for rehearing therein, this court further emphasized:
"A person accused of crime has no natural or inalienable right to a continuance. At common law such application was addressed to the sound discretion of the court and its decision could not be assigned as error, but now in this state such decisions are reviewable by appellate tribunals, but the ruling of the trial court will not be disturbed in the absence of a clear abuse of discretion. [Cases cited.]"
Cf. Brown v. State, 224 So.2d 789 (Fla. 3rd DCA, 1969), Kish v. State, 192 So.2d 315 (Fla. 3rd DCA, 1966).
We find no merit in appellant's contention that the trial court erroneously restricted his cross-examination of Dennis Bender, but rather, a review of the record supports appellee's assertion that appellant's counsel was not restricted in his cross-examination of Bender. In a side bar conference, the trial judge informed defense counsel that, if he cross-examined Bender as to his reasons for allowing Hoy to return to his home on the night he was questioned about the crimes, it would open the record to evidence of a polygraph examination. It was a tactical choice on the part of appellant's counsel to discontinue the line of questions.
Appellant urges that the trial court erred in restricting his cross-examination of witness Mills who had found the bodies on the beach. Appellee emphasizes that that which was sought to be elicited by appellant's line of question concerning this point was not relevant to the cause and was beyond the scope of direct. We find no error in the trial court's sustaining the State's objection to testimony regarding Mill's picture-taking activities.
*832 Appellant objected to evidence of comparisons of hair found on one of the victims with hair samples from Jesse Lamar Hall. He also objected to evidence of ownership and possession by Hall of a propane torch allegedly used to destroy Sawyer's wallet. We find appellant's argument that his right to confrontation was violated because Hall was not available for cross-examination to be likewise without merit.
Finally, with regard to the imposition of the sentence of death, appellant argues that the trial court failed to give full weight to the mitigating circumstances enumerated in Section 921.141(6), Florida Statutes, and alleges that the capital felonies committed in this case were not especially heinous, atrocious or cruel. We cannot agree with appellant that, under the totality of the circumstances present in the instant cause, the death sentence was not warranted. The advisory recommendation of the jury is to be accorded great weight, but the ultimate decision as to whether the death penalty should be imposed rests with the trial judge. Cf. Tedder v. State, 322 So.2d 908 (Fla. 1975), Lamadline v. State, 303 So.2d 17 (Fla. 1974), State v. Dixon, 283 So.2d 1 (Fla. 1973).
Since the trial judge did not delineate in detail each mitigating and aggravating circumstance present, this court entered an order for clarification advising the trial judge to submit amended findings setting out in more detail the aggravating and mitigating circumstances which he found to exist. He was further directed, pursuant to the mandate of Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393, decided March 22, 1977, to inform this Court whether the psychiatric evaluation and presentence investigation reports were considered by the judge and, if considered, whether they were disclosed to the defendant.
In his original findings of fact, the trial judge explained:
"The undersigned Judge has long been opposed philosophically to capital punishment, and publicly has so stated on numerous occasions throughout the years.
"The Legislature of Florida has stated its philosophy and belief to be that capital punishment should be imposed in certain cases by enactment of a law providing for the imposition of same when there are aggravating circumstances and insufficient mitigating circumstances to outweigh the aggravating circumstances.
.....
"Until the Supreme Court of the United States rules to the contrary, this Court must follow the dictates of the law and should not indulge in the sophistry of placing its judgment superior to the requirements of the law."
The trial judge then concluded:
"The Court is of the opinion that if there is any case it has ever heard wherein the imposition of the death penalty is called for, it is this case.
"Not only does the Court find aggravating circumstances in that the capital felonies were committed while the defendant was engaged, or was an accomplice in the commission of a rape, but further finds that the capital felonies were especially heinous, atrocious and cruel, and finds that there are insufficient mitigating circumstances as enumerated in Section 921.141, Florida Statutes, to outweigh the aforesaid aggravating circumstances. The pitiless, wicked, shockingly evil and vile method of imposing atrocities and death upon the young people who were the victims in these cases leads the Court to the conclusion that the recommendation to life imprisonment made by the jury should be disregarded by the Court and the death penalty imposed. In accordance with the aforesaid findings of fact, which are filed herein, as required by Section 921.141(3), Florida Statutes, the Court will impose the death penalty upon the defendant in these cases."
The clarification order discloses that the entire presentence investigation report which was considered by the court and report of Dr. Cosma were furnished appellant so that he had full opportunity to deny or explain anything or everything in either. *833 As to the appropriate and adequate clarification of the aggravating and mitigating circumstances, the trial judge explained:
"The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of a rape, at gunpoint, of a 16 year-old girl.
"The capital felony was committed for the purpose of avoiding a lawful arrest in the sense that it was to insure that there would be no witnesses to testify against the killer.
"The capital felony was especially heinous, atrocious and cruel in that two attractive, vibrant teen-age youngsters in love with life and in love with each other were killed in cold blood in each others presence deliberately and mercilessly. The girl was raped in the presence of her fiance, and he was killed when he tried to help her. She had to know, as she was being violated, and begging for help, that she too would die at the hands of her merciless ravishers  as she did die.
"This appellant confessed to his guilt on numerous occasions, both before and after his repudiation of the first confession. His knowledge of intimate details that could only have been known to a participant in the crime furnishes absolute corroboration of his confession and the polygraph test taken of him also corroborates the confession.
"The only mitigating circumstances the undersigned could find were the defendant's lack of a significant history of prior criminal activity and the age of the defendant (22) at the time of the crime. These are insufficient, in the mind of the undersigned, to outweigh the aforesaid aggravating circumstances."
This court, in State v. Dixon, supra, discussing what is meant by "heinous, atrocious or cruel," stated:
"It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily tortuous to the victim."
Sub judice, we have the commission of capital crimes accompanied by such additional acts as to set them apart from the norm of capital felonies. The facts before us supporting the sentence of death are clear and convincing.
We have listened carefully to oral argument, examined and considered the record in light of the assignments of error and briefs filed, and we have also, pursuant to Rule 6.16(b), Florida Appellate Rules, reviewed the evidence to determine whether the interests of justice require a new trial, with the result that we find no reversible error is made to appear and the evidence in the record before us does not reveal that the ends of justice require that a new trial on the issue of guilt be awarded.
Accordingly, no reversible error appearing, the judgments and sentences of the trial court are hereby affirmed.
It is so ordered.
OVERTON, C.J., and ADKINS, BOYD, SUNDBERG, HATCHETT and KARL, JJ., concur.
ENGLAND, J., concurs in part and dissents in part with an opinion.
ENGLAND, Justice, concurring in part and dissenting in part.
I concur in the affirmance of Hoy's convictions, but I would follow the jury's recommendation of life imprisonment as the appropriate sentences. Tedder v. State, 322 So.2d 908 (Fla. 1975).