503 So.2d 310 (1987)
Jeffrey Allen MUEHLEMAN, Appellant,
v.
STATE of Florida, Appellee.
No. 65546.
Supreme Court of Florida.
January 8, 1987.
Rehearing Denied March 27, 1987.
*311 James Marion Moorman, Public Defender and Robert F. Moeller, Asst. Public Defender, Bartow, for appellant.
Jim Smith, Atty. Gen. and Gary O. Welch and Frank J. Migliore, Jr., Asst. Attys. Gen., Tampa, for appellee.
ADKINS, Justice.
Jeffrey Allen Muehleman, convicted of first-degree murder pursuant to a plea of guilt and sentenced to death, appeals his conviction and sentence. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm both.
The testimony and evidence before the trial court established the following scenario. Muehleman, identifying himself as Jeff Williams, was hired by the victim, 97-year-old Earl Baughman, as a "helper" on May 2, 1983. By the afternoon of May 4, he had decided to kill and rob the victim, and sought to enlist the aid of an acquaintance in committing the robbery and disposing of the body. Because the acquaintance did not show, Muehleman committed the brutal murder by himself on the evening of May 4.
He began that evening by placing on the kitchen table two almost-empty coffee cups and some bread crumbs in order to create an appearance the next morning that he and the victim had eaten breakfast and gone for a ride in the victim's car. He then wiped down the apartment in order to remove his fingerprints, grabbed a cast iron frying pan, and crept into the bedroom where the victim lay sleeping. With the frying pan, he repeatedly struck the victim's head with sufficient force to send flying the man's dentures and splatter the bed linens, walls and curtains with blood.
Muehleman then attempted to strangle the elderly man, but found his neck too flexible to successfully restrict the flow of blood to his brain. In a later statement, Muehleman indicated that the victim at this point lay helpless, staring up into the murderer's face, and remained conscious enough to beg for mercy, muttering words to the effect of "Jeff, oh, Jeff ..." No *312 mercy was forthcoming. Muehleman proceeded to remove the plastic wrappers from two newspapers and shoved them into the victim's throat. Frustrated when the plastic bags continued to bubble in and out with the victim's weakening breath, he pushed the suffocating plastic mass deeper.
He then stole $150 from the victim, wrapped the body in the bloodied bedcovers, and placed it in the trunk of the victim's 1961 Cadillac. After stopping by the garage in which he was staying to stow the cash and other personal objects he had stolen, he returned to the victim's residence and burned some of the blood-covered linens and the victim's identification in a barrel in the backyard. He then wiped down the car for fingerprints, drove it to a nearby apartment complex, and abandoned the vehicle.
The disappearance of the victim, along with his car, immediately aroused suspicion because he did not drive. On May 6, a witness called the police and informed them that he had seen the victim's early model Cadillac, described in a broadcast, parked in front of the garage in which Muehleman had been residing. A police officer was dispatched to that address to question Muehleman. Upon arriving at the address, the officer was informed that Muehleman had borrowed a bicycle and would be returning shortly. The police left the residence, and within thirty seconds spotted Muehleman.
When Muehleman saw the police car, he covered his face with his arm, looked up, jumped off the bicycle and turned around. Before he could run, the officer grabbed his arm and asked him his name, and he responded "Ed Buchanan." When the witness positively identified him as "Jeff," Muehleman was arrested on charges of obstructing justice by providing false information, a first-degree misdemeanor under section 843.03, Florida Statutes (1983). Muehleman was read the Miranda warnings and agreed to talk. Denying any involvement in the victim's disappearance, Muehleman indicated that he had taken a monogrammed cigarette lighter and some other small objects belonging to the victim without permission.
On May 9, Muehleman invoked his right to remain silent. Five days later, the decomposing body was discovered in the trunk of the parked car. While Muehleman continued to protest the charges in interviews with police authorities, he approached a fellow inmate and began to discuss with him details of the killing. The inmate, Ronald Rewis, eventually approached authorities and agreed to surreptitiously record incriminating conversations with Muehleman.
On June 8, 1983, Muehleman requested an interview with authorities. During this interview, he was informed of the evidence which had been gathered against him and confessed in some detail. That day, Muehleman was formally booked on first-degree murder charges. A final statement was given on June 10 concerning additional details of the crime.
Muehleman subsequently moved to suppress the statements he had made and the physical evidence obtained against him, alleging several violations of his constitutional rights. When these motions were denied, he pled guilty. Following his sentencing hearing, the jury recommended by a vote of ten to two that Muehleman be sentenced to death. Finding four aggravating and two mitigating circumstances, the trial court followed the jury's recommendation.
Muehleman urges a number of grounds in support of his claim that his conviction and sentence should be vacated, or alternatively that he receive a new penalty trial.
We first note that the statutory provision that "[a] defendant who pleads guilty ... with no express reservation of the right to appeal shall have no right to a direct appeal," section 924.06(3), Florida Statutes (1985); Fla.R.App.P. 9.140(b), has no application in the context of capital review. In entering his plea of guilt, Muehleman answered the following question from the court as follows:
Q: You also give up the right to appeal any error that may have been committed *313 thus far in the proceedings, you understand that?
A: Yes, sir.
Nevertheless, we follow the mandate of section 921.141(4), Florida Statutes (1985), that "[t]he judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida," and turn to an examination of the alleged errors now raised.
First, it is argued that the trial court committed reversible error in refusing to suppress evidence allegedly obtained in violation of Muehleman's fourth, fifth and sixth amendment rights. These contentions shall be examined in order.
Muehleman contends, initially, that his fourth amendment rights were violated first by an illegal arrest and later by some illegal searches of the garage in which he was temporarily residing. We reject both contentions. First, the officer acted properly in effecting the initial stop of Muehleman. The stop was amply justified by "specific and articulable facts ... taken together with rational inferences from these facts." State v. Webb, 398 So.2d 820, 822 (Fla. 1981) (applying Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968)). The elderly victim had disappeared along with his car, and he did not drive. His housekeeper of two days had similarly disappeared. A BOLO had been issued the day before, and a reputable citizen had contacted the police and linked Muehleman to the incident through the victim's distinctive automobile. In light of Muehleman's furtive behavior and apparent attempt to flee, the officer's suspicion was eminently reasonable and he acted properly in detaining the suspect for the purpose of ascertaining his identity. § 901.151(2), Fla. Stat. (1983); State v. Cook, 475 So.2d 285 (Fla. 5th DCA 1985).
When the suspect falsely identified himself as Ed Buchanan, and an apparently reliable witness identified him as "Jeff," the officer had probable cause to arrest Muehleman on the first-degree misdemeanor charge of "obstructing justice by false information" under section 843.05, Florida Statutes (1983). This Court's subsequent invalidation of the statute in Bunnell v. State, 453 So.2d 808 (Fla. 1984), does not render the earlier arrest invalid. Michigan v. DeFillipo, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). We therefore find the initial detention and arrest lawful. See State v. Stevens, 421 So.2d 41 (Fla.3d DCA 1982).
Muehleman's second fourth amendment claim involves three warrantless searches of the garage in which he had temporarily resided. His initial argument, that the search was tainted by the illegal arrest, United States v. Robinson, 625 F.2d 1211 (5th Cir.1980); Norman v. State, 379 So.2d 643 (Fla. 1980), must fall in light of our disposition of the first issue.
Even acknowledging that Muehleman may have had a "reasonable expectation of privacy" in the garage, we find that under these circumstances the state has met its burden of establishing the validity of his consent to the initial search. Raffield v. State, 351 So.2d 945 (Fla. 1977). Further, we find that on these facts the consent given by the property's owners to two later searches was properly obtained. The owners had merely allowed Muehleman to temporarily sleep in the garage, which was not an apartment; the owners continued to use the garage for storage. A highly informal rent agreement was reached and the owners' continued access to the garage remained unquestioned. Because these circumstances leave little doubt as to the owners' capacity to validly consent to the search, Preston v. State, 444 So.2d 939 (Fla. 1984); Silva v. State, 344 So.2d 559 (Fla. 1977), we reject Muehleman's second fourth amendment claim.
Muehleman next contends that his fifth amendment privilege against self-incrimination was violated in the course of four interviews conducted by the police after he had invoked his right to silence on May 9. The facts of the case do not support this contention. As noted by the United States Supreme Court in Michigan v. Mosley, 423 U.S. 96, 102-03, 96 S.Ct. 321, 325-26, 46 L.Ed.2d 313 (1975), Miranda cannot "sensibly be read to create a per se proscription *314 of indefinite duration upon any further questioning by any police officer ... once the person in custody has indicated a desire to remain silent."
The first interview complained of was conducted eight days after his invocation of his right to silence on May 17. Clearly, the authorities had scrupulously honored Muehleman's "right to cut off questioning" as mandated by Mosley. No contention is made that this interview was not conducted in full accordance with Miranda; it was in fact conducted pursuant to the obtaining of a written waiver. The later interviews not only followed the signing of written waivers, but were initiated by Muehleman. We decline to depart from our holding, soundly based in sensible fifth amendment jurisprudence, that "[t]he law does accord [a suspect] the opportunity to voluntarily change his mind and confess." Witt v. State, 342 So.2d 497, 500 (Fla.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977); Cannady v. State, 427 So.2d 723 (Fla. 1983).
Muehleman's next claim involves an alleged violation of his sixth amendment right to counsel. He contends that fellow inmate Ronald Rewis became a state agent for the impermissible purpose of acquiring incriminating evidence which properly lay beyond the state's reach. Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). We find in this case no violation of Muehleman's sixth amendment rights, as a review of the facts discloses that his incriminating admissions were not a product of a "`stratagem deliberately designed to elicit an incriminating statement.'" Miller v. State, 415 So.2d 1262, 1263 (Fla. 1982), cert. denied, 459 U.S. 1158, 103 S.Ct. 802, 74 L.Ed.2d 1005 (1983) (quoting Malone v. State, 390 So.2d 338, 339 (Fla. 1980), cert. denied, 450 U.S. 1034, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981)).
First, Muehleman, apparently eager to talk, approached Rewis and began to repeatedly attempt to discuss details of the crime with him. Second, after unsuccessfully attempting to dissuade Muehleman from "talking too much," Rewis approached the authorities on his own initiative. Bottoson v. State, 443 So.2d 962 (Fla. 1983), cert. denied, 469 U.S. 873, 105 S.Ct. 223, 83 L.Ed.2d 153 (1984); Barfield v. State, 402 So.2d 377 (Fla. 1981). Third, Rewis was at that point instructed not to initiate any conversations with the suspect. Finally, no evidence exists in the record that Rewis' efforts were induced by promises of any form of compensation. The contingent fee arrangement reflecting an improper relationship between police and informant in Henry is absent in this case.
In light of these circumstances, we cannot say that the authorities' eventual use of a tape recording device, wired to Rewis to record information which had been offered freely by Muehleman and previously reported by Rewis, itself violated Muehleman's sixth amendment rights. We find, as did the trial court, that the mere use of the tape recorder did not establish the more central question of whether the statements were deliberately elicited by Rewis acting in an unlawful capacity as an agent of the state. In this case, marked by Muehleman's penchant for loose talk and Rewis' turning to the authorities on his own initiative, we cannot find that the use of the tape recording device transformed these facts into a violation of Muehleman's right to counsel.
Muehleman's next issue on appeal turns on our disposition of the above constitutional claims. Based on his contention that his plea, and resulting conviction and sentence, were bottomed on inadmissible evidence, he argues that his conviction and sentence must now be vacated. Anderson v. State, 420 So.2d 574 (Fla. 1982).
As we have rejected his claims as to the admissibility of the evidence, we likewise reject the instant claim. In fact, having carefully reviewed the record, we find Muehleman's plea of guilty to charges of first-degree murder to have been freely and voluntarily given and amply supported by a factual basis in the record. LeDuc v. State, 365 So.2d 149 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 175, 62 *315 L.Ed.2d 114 (1979); § 921.141(4), Fla. Stat. (1985); Fla.R.App.P. 9.140(f).
In his third issue on appeal, Muehleman argues that his absence from the courtroom during a pre-trial suppression hearing and the later jury charge conference violated his sixth amendment right of confrontation and his fourteenth amendment due process rights. We do not agree.
First, the voluntariness of his absence at both phases of the proceedings renders inapplicable such precedent as Francis v. State, 413 So.2d 1175 (Fla. 1982). Second, this suppression hearing was not a crucial stage of the trial, "where fundamental fairness might be thwarted by his absence." Herzog v. State, 439 So.2d 1372, 1375 (Fla. 1983) (quoting Francis, 413 So.2d at 1177). A capital defendant may waive his presence at a crucial state of the proceedings, Peede v. State, 474 So.2d 808 (Fla. 1985), and should therefore a fortiori be free to waive his right to be present at a non-crucial stage.
The waiver through counsel of Muehleman's right to attend the jury charge conference was given as follows:
Your Honor, I have consulted with Jeff and it has been a long case, a long week for him. He's waiving his presence to be present during the jury instruction conference that we are holding at this time. He requested to be sent back to the facility at this time.
Muehleman's obvious participation in this waiver represents more than the mere acquiescence in and knowledge of counsel's request which has been found sufficient in Amazon v. State, 487 So.2d 8 (Fla. 1986), and State v. Melendez, 244 So.2d 137 (Fla. 1971). Under these circumstances, Muehleman should not now be heard to argue that his absence at the charge conference prejudiced his case. We therefore find no basis for his claim that his absences violated his constitutional right to be present at trial.
Muehleman next contends that the trial court erred in admitting into evidence during the penalty phase a "Juvenile Social History Report" detailing his juvenile criminal record. We find no error. As we noted in Welty v. State, 402 So.2d 1159, 1162-63 (Fla. 1981), "[t]he trial court has wide discretion in areas concerning the admission of evidence, and, unless an abuse of discretion can be shown, its rulings will not be disturbed."
First, the report's status as hearsay did not itself require exclusion from the jurors' consideration in the context of the penalty phase of a capital trial. § 921.141(1), Fla. Stat. (1985). Second, we once again affirm the proposition that the bottom line concern in questions involving the admissibility of evidence is relevance. Ruffin v. State, 397 So.2d 277 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981); Ashley v. State, 265 So.2d 685 (Fla. 1972). The evidence became relevant when a psychiatric expert witness for the defense stated that he had considered the report in formulating his opinion. "[I]t is proper for a party to fully inquire into the history utilized by the expert to determine whether the expert's opinion has a proper basis." Parker v. State, 476 So.2d 134, 139 (Fla. 1985).
Finding no abuse of discretion, it is not the proper role of this Court upon appeal to reweigh questions of relevance and prejudice. We therefore reject this claim.
Muehleman next argues that the trial court erred in allowing three police officers to testify as to previous crimes he had committed in Illinois. He contends that the jury should not have heard of these crimes  involving an assault on his mother, burglary, theft, and possession of drugs  when the defense had waived the mitigating factor of "no significant history of prior criminal activity." § 921.141(6)(a), Fla. Stat. (1985); Maggard v. State, 399 So.2d 973 (Fla.), cert. denied, 454 U.S. 1059, 102 S.Ct. 610, 70 L.Ed.2d 598 (1981). Muehleman points to Maggard as requiring reversal and a new sentencing hearing.
In Maggard, we found reversible error in the state's presentation of extensive evidence of the defendant's prior criminal history when the defense had waived any reliance on the relevant mitigating factor. Noting that "[m]itigating factors are for the defendant's benefit, and the State *316 should not be allowed to present damaging evidence against the defendant to rebut a mitigating circumstance that the defendant expressly concedes does not exist," 399 So.2d at 978, we found no proper basis for admission of the evidence.
We find the instant case closer to Parker v. State, 476 So.2d 134 (Fla. 1985), than Maggard. In Parker, as in Maggard and the case at bar, the defendant had expressly waived any intention to rely upon the mitigating circumstance of no significant prior criminal history. In Parker, too, the trial court admitted evidence of prior crimes. The difference between Parker and Maggard is that in the former we found no error in the trial court's action.
We find this case controlled by Parker, in which the evidence was properly admitted in response to the extensive exploration by the defense of "appellant's past personal and social developmental history, including a prior criminal history." 476 So.2d at 139. The presentation of the previous crimes in Parker through cross-examination is functionally equivalent to the evidence here presented in rebuttal. In the instant case, unlike in Maggard, the trial court exercised its discretion in admitting the testimony not to rebut a phantom, waived mitigating factor, but to expose the jury to a more complete picture of those aspects of the defendant's history which had been put in issue. The testimony of Muehleman's assault on his mother, first, served to properly rebut, or at least supplement, extensive evidence presented by the defense focusing on the mother/son relationship and implying that his mother had indirectly caused the murder through lapses in Muehleman's upbringing. The trial court admitted the testimony concerning the other crimes in rebuttal to the defense's expert testimony, presented in mitigation, that Muehleman lacked substantial capacity to plan in advance and execute crimes.
Parker made clear that the mere existence of a strategical waiver by the defense of the mitigating factor does not end the analysis. In order to evaluate the alleged error, we must consider the evidence admitted, any prejudice accruing to the defendant therefrom, and the purpose for its admission. See Jennings v. State, 453 So.2d 1109, 1114 (Fla. 1984), cert. granted and judgment vacated on other grounds, 470 U.S. 1002, 105 S.Ct. 1351, 84 L.Ed.2d 374 (1985). In light of the relevance of this evidence in rebutting specific evidence presented by the defense, we find no abuse of discretion in this case.
Muehleman similarly argues that the trial court erred in admitting the transcript of a taped interview of Richard Wesley, an acquaintance of Muehleman's who originally planned to participate in the murder. It is contended that the admission of the extremely prejudicial evidence, which clashed with Muehleman's testimony that he had only intended to rob the victim, violated his sixth amendment right to confront the witnesses against him. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Hall v. State, 381 So.2d 683 (Fla. 1978).
We noted in Hall that "[t]he crux of a Bruton violation is the introduction of statements which incriminate an accused without affording him an opportunity to cross-examine the declarant." 381 So.2d at 687. We find this language inapplicable, as the state offered to make Wesley available for cross-examination. The defense then strategically, and probably wisely, declined to accept this offer. Muehleman may not now argue that the lack of cross-examination violated his right of confrontation.
In his seventh argument on appeal, Muehleman argues that the trial court improperly restricted his presentation of evidence in mitigation, including the testimony of his grandmother, and limited evidence of Ronald Rewis' prior criminal history. Because fifteen witnesses testified as to Muehleman's character, and because the jury was informed of Rewis' criminal history, the evidence excluded would have been irrelevant and cumulative in nature. Its exclusion was therefore well within the trial court's range of discretion.
Muehleman next attacks certain remarks made during the prosecutor's closing argument *317 which, he contends, improperly influenced the jurors' passions and resulted in prejudice to his case. We note at the outset that we agree with the state that precedent cited such as Goddard v. State, 143 Fla. 28, 196 So. 596 (Fla. 1940), and Harper v. State, 411 So.2d 235 (Fla. 3d DCA 1982), sheds little light on the instant issue. None of those cases involved the penalty phase of a capital trial. As we noted in Bush v. State, 461 So.2d 936, 941 (Fla. 1984), cert. denied, ___ U.S. ___, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986), "`the rule against inflammatory and abusive argument by a state's attorney is clear, each case must be considered upon its own merits and within the circumstances pertaining when the questionable statements were made.'" (quoting Darden v. State, 329 So.2d 287, 291 (Fla. 1976), cert. dismissed, 430 U.S. 704, 97 S.Ct. 1671, 51 L.Ed.2d 751 (1977)).
The propriety of prosecutorial comments must be examined in context. A statement found out of place and prejudicial when made to a jury evaluating the defendant's guilt may quite properly bear on the aggravating circumstances set forth in section 921.141(5). Muehleman complains, for instance, of the prosecutor's characterization of the victim as a "feeble, sickly, 97-year-old man." Such a statement could indeed tend to excite passion in the jury. We cannot, however, rewrite on the behalf of the defense the horrible facts of what occurred or make the slaying appear to be less reprehensible than it actually was.
We find that the statements complained of were highly relevant in establishing the following aggravating factors: the commission of the murder during the course of a robbery, section 921.141(5)(d); its commission for the purpose of avoiding a lawful arrest, section 921.141(5)(e); the especially heinous, atrocious and cruel nature of the crime, section 921.141(5)(h); and its cold, calculated and premeditated nature, section 921.141(5)(i). In sum, we find no abuse of discretion in the trial court's supervision of the prosecutor's comments during the course of the trial. Teffeteller v. State, 439 So.2d 840 (Fla. 1983), cert. denied, 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 754 (1984).
Muehleman next attacks the jury instructions as given and the aggravating and mitigating circumstances found applicable to his case. We have carefully reviewed each of these contentions. They are without merit.
Finally, in a supplemental brief, Muehleman argues that our recent decision of Van Royal v. State, 497 So.2d 625 (Fla. 1986), compels us to now vacate Muehleman's sentence of death and remand for the imposition of a life sentence. We find the instant case readily distinguishable from Van Royal, in which we were forced to conclude from a number of circumstances that "this Court cannot assure itself that the trial judge based the oral sentence [of death] on a well-reasoned application of the factors set out in section 921.141(5) and (6) [, Florida Statutes (1981)] and in Tedder v. State, 322 So.2d 908 (Fla. 1975)," at 628, and find the death sentences in the case "unsupported." Id. In that case, the trial court's written findings overrode a jury recommendation of life, followed sentencing by over six months, and were filed only after the record on appeal had been filed with this Court. Although we once again vigorously stress that these written findings should be prepared contemporaneously with the imposition of sentence, we cannot find Van Royal determinative of this case. Here, the written findings followed the jury's recommendation of death, and were filed two and one half months after sentencing, two months prior to the certification of the record to this Court. As in Ferguson v. State, 417 So.2d 639, 641 (Fla. 1982), we hold that "[i]nasmuch as the supplemental record includes the trial judge's written findings this issue is now moot."
We therefore affirm Muehleman's conviction and the death sentence imposed.
It is so ordered.
McDONALD, C.J., and OVERTON and EHRLICH, JJ., concur.
*318 SHAW, J., concurs specially with opinion.
BARKETT, J., concurs specially with opinion.
SHAW, Justice, specially concurring.
The record here is not entirely clear, but it appears that the trial judge and counsel met prior to trial to consider a series of defense motions without summoning appellant to be present. One or more of these motions concerned the suppression of evidence. After approximately thirty to sixty minutes of arguments by counsel and rulings by the court, a recess was called to permit defense counsel to consult appellant. When the court reconvened shortly thereafter, appellant was present and heard the prosecutor comment that appellant had been absent earlier and had not waived his absence. Defense counsel replied that there was no problem. The trial court then proceeded to hear further argument and to receive testimony on the suppression of evidence. Under these circumstances I am satisfied that appellant ratified his earlier absence and that there was no error or, assuming there was error, it was harmless error.
I write to express my disagreement with the majority holding that a suppression hearing is not a crucial stage of the trial. The United States Supreme Court has recognized that "suppression hearings often are as important as the trial itself." Waller v. Georgia, 467 U.S. 39, 46, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984). The case at hand is an apt illustration. After the trial judge denied the motions to suppress the evidence, appellant immediately changed his plea from not guilty to guilty. In short, the entire issue of guilt turned on the suppression issue and the suppression hearing was, in effect, the trial. The right of a defendant to be present at a suppression hearing is crucial to the right of confrontation. Normally, a suppression hearing consists of the state putting on witnesses and evidence to show that the police acted properly and there was no violation of the defendant's constitutional rights as, for example, in obtaining a confession, affecting an arrest, or conducting a search and seizure. More often than not, the defendant was present when the evidence was obtained and his presence at the suppression hearing may well be crucial to effective cross examination and representation by defense counsel. I am persuaded that appellant ratified his partial absence here and that the error was harmless; but, I reject the general notion that a suppression hearing is not a crucial stage of the trial.
As for the voluntariness of appellant's absence during part of the suppression hearing, the record is silent. Under Florida Rule of Criminal Procedure 3.180(b), "voluntary" is a word of art and is not used in the dictionary sense. It is limited to those instances where a defendant voluntarily absents himself without leave of court or is removed from court because of disruptive conduct. The record is silent but we should not assume that an absent defendant does not have leave of court to be absent or has been removed at the court's direction. I note here that court and counsel proceeded without appellant until they reached a point where it was necessary to consult appellant, whereupon a recess was taken and appellant was present shortly thereafter during the latter part of the hearing. A defendant charged with first-degree murder does not routinely come and go at will. The most logical explanation for appellant's early absence and later presence is simple: court and counsel chose to proceed initially without summoning appellant from his holding cell. The record is silent as to whether this was done with or without his knowledge.
I am also persuaded, contrary to the holding in Herzog v. State, 439 So.2d 1372 (Fla. 1983), on which the majority relies, that a defendant is required to be present during a pretrial suppression hearing by Florida Rule of Criminal Procedure 3.180(a)(3) and/or (6). Generically, a pretrial suppression hearing is a pretrial conference for the purpose of addressing evidence outside the presence of the jury to determine if the evidence should be introduced to the jury.
*319 BARKETT, Justice, specially concurring.
First, I agree with the position expressed by Justice Shaw in his concurring opinion except that I read the majority decision as holding only that the suppression hearing in this case was not a crucial stage of the proceedings. I do not read the majority opinion as establishing a rule that is applicable to all suppression hearings.
Second, I concur with the majority on the Van Royal issue only because the record reflects that the trial judge at the time of sentencing did engage in the requisite weighing process, albeit in a rudimentary fashion.